J-S30037-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JALANI WILSON | : | |
| | : | |
| Appellant | : | No. 10 MDA 2024 |

Appeal from the Judgment of Sentence Entered November 30, 2023
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0003534-2021

BEFORE: PANELLA, P.J.E., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED: SEPTEMBER 25, 2024**

Appellant Jalani Wilson appeals from the judgment of sentence entered in the Court of Common Pleas of Dauphin County following his conviction by a jury on one count of possession of a firearm prohibited, one count of possession with the intent to deliver a controlled substance, and one count of possession of drug paraphernalia.[1] After a careful review, we affirm.

The relevant facts and procedural history are as follows: On July 29, 2021, the police executed a search warrant at a second-floor duplex on the 1900 block of Chestnut Street in Harrisburg, Pennsylvania ("the duplex"). On

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 6105(a)(1), 35 P.S. § 780-113(a)(30), and 35 P.S. § 780-113(a)(32), respectively.

September 24, 2021, the Commonwealth filed an Information charging Appellant with the crimes *supra*.

On August 14, 2023, Appellant, who was represented by counsel, proceeded to a jury trial. Harrisburg Police Detective Nicholas Ishman testified that he is assigned to the vice unit, which deals primarily with street-level drug crimes. N.T., 8/14/23, at 25. Detective Ishman was on duty on July 29, 2021, and he assisted in executing the search warrant at the duplex. *Id.* at 30. He clarified that the duplex spanned from the second floor to the third floor; the first-floor duplex was vacant. *Id.*

Detective Ishman testified the Dauphin County SWAT team was the first agency to enter the duplex at approximately 6:00 a.m., and they discovered two adults inside of the duplex. *Id.* at 34, 52. The duo was detained and placed in a room. *Id.* at 34. Upon entering the duplex's second-floor middle spare room, Detective Ishman saw a digital scale and a jar of money. *Id.* at 37. Both items were seized. *Id.* He also saw another digital scale with white residue on it, a plate, black latex gloves, a 5-gallon bucket with a box of sandwich bags, a wallet, and a large digital scale with white residue on it. *Id.* at 38. These items were seized. *Id.*

Detective Ishman testified that, in his experience, the plate and gloves were used for packaging illegal narcotics. *Id.* He noted that the 5-gallon

bucket contained marijuana,[2] and it is "common for marijuana to be shipped in 5-gallon buckets from…other locations throughout the country." *Id.* at 39. Detective Ishman testified that marijuana is often sold on the street in sandwich bags such as those seized from the room. *Id.* at 42-43. He noted that, underneath the marijuana in the 5-gallon bucket, he discovered five large vacuum-sealed bags, which were empty but contained marijuana residue. *Id.* at 42. He noted the large vacuum-sealed bags would hold anywhere between three and five pounds of marijuana. *Id.* at 43.

Detective Ishman indicated that several additional empty 5-gallon buckets were found in the second-floor middle spare room. *Id.* at 40. The detective noted the empty 5-gallon buckets "smelled of marijuana." *Id.* Moreover, a money counter and a gold box filled with U.S. currency were seized from this room. *Id.* Detective Ishman testified that, in his experience, "the drug trade is a cash business, so [the money counter] makes counting money quicker." *Id.*

Detective Ishman opined that, based on his training and experience, the items he seized from the second-floor middle spare room were "used for packaging or in some way processing" controlled substances. *Id.* at 46. He opined that the controlled substance, which he seized, was not for personal

---

[2] The parties stipulated that the substance was sent to the Pennsylvania State Police lab for testing, and if called to testify, forensic scientist Kristy Reich would confirm that the substance was marijuana, which weighed 698 grams plus or minus 4 grams. *Id.* at 47, 49.

use, and he noted the absence of items typically found in residences of people who use controlled substances. *Id.* at 49. For example, he did not find either blunt wrappers or a smoking pipe. *Id.* He further opined that the marijuana was not "medical marijuana" since it was packaged in a vacuum-sealed bag without any patient label. *Id.* at 50. He opined it was marijuana to be sold illegally on the street. *Id.*

On cross-examination, Detective Ishman confirmed that, prior to the execution of the search warrant, he was involved in an investigation regarding drug activity at the duplex. *Id.* at 51. Specifically, he acted as surveillance while a confidential informant purchased crack cocaine from the duplex. *Id.* He noted that, on the day the search warrant was executed, Appellant was one of the people found inside of the duplex, and he had a brief conversation with Appellant about his Rottweiler puppy. *Id.* at 53. He did not see Appellant in possession of any firearms at this time. *Id.*

Corporal Kevin Martin, who was assigned to the Dauphin County Drug Task Force,[3] assisted in the execution of the search warrant. *Id.* at 61. Specifically, he searched the closet and areas surrounding the closet in the second-floor middle spare room. *Id.* at 63. From the closet, the corporal seized two boxes of unopened .40 caliber ammunition and an ammunition

---

[3] Corporal Martin testified the Drug Task Force is comprised of officers from different departments. *Id.* at 62.

pouch containing eight magazines with .223 rounds. *Id.* at 64-66. He noted that the .223 ammunition is used for a rifle. *Id.* at 68. Corporal Martin indicated that the ammunition could be purchased from any gun store without the purchaser undergoing any background check. *Id.*

On cross-examination, Corporal Martin confirmed that an AR-style pistol could also use the .223 rounds, and to the best of his knowledge, it is generally not illegal for a person to possess ammunition. *Id.* at 70. He confirmed that, on the day of the search, he did not see Appellant in possession of any ammunition. *Id.* at 71.

Detective Keegan Wenner, who was also a member of the Dauphin County Drug Task Force, assisted in the execution of the search warrant. Specifically, he searched the large bedroom on the third floor of the duplex. *Id.* at 75. He testified that he discovered an AR-style rifle wrapped in a purple pillowcase inside of a netted clothes hamper, which was sitting alongside of a wall by the bed. *Id.* at 78-80. He indicated the AR-style rifle was loaded with .223 ammunition. *Id.* at 83-84. Detective Wenner opined it was a "very small" rifle and not a standard size rifle. *Id.* at 85. He noted the electronic trace ("eTrace") of the firearm's history listed the firearm as a pistol, model RF-15.[4] *Id.* at 92.

---

[4] There was some dispute as to whether the firearm was an AR-style rifle or an AR-style pistol. In any event, it is undisputed that it was an operable, loaded firearm.

Detective Wenner testified that, when a person purchases a firearm, he or she must pass a background check, and a Pennsylvania gun dealer must keep a record of the sale. *Id.* at 87-88. He noted that "purchasing" does not always equate to "ownership" since people can purchase firearms for other people. *Id.* at 88. There is no database of "current owners or possessors" of firearms. *Id.* at 91. Further, he noted that records of purchases from states outside of Pennsylvania do not always carry over to Pennsylvania. *Id.* at 90. Thus, if the police run a serial number for a firearm purchased in another state, it may be reported back as "no record of sale." *Id.*

Moreover, regarding the firearm seized by Detective Wenner from the large bedroom, the eTrace revealed that the last known purchaser of the firearm was Britini Lyn Mathis, and the duplex was listed as her last known address. *Id.* The firearm was purchased on March 10, 2019, from a dealer at a gun show. *Id.*

On cross-examination, Detective Wenner admitted that, when he searched the large bedroom, he observed female clothing therein. *Id.* at 95. On re-direct examination, Detective Wenner testified the firearm was not locked in any type of box, and no key was needed to access the firearm, which was found in the netted clothes hamper. *Id.* at 103-04.

Karen Lyda, a criminal investigator of forensics for the Harrisburg Bureau of Police, testified that "fingerprints are very delicate." *Id.* at 109. She indicated that she has attempted to lift and match fingerprints for

"probably a thousand guns" and has successfully matched fingerprints only "about five times." *Id.* at 111. She testified that a pillowcase could "absolutely" wipe fingerprints off a gun. *Id.* at 110. Regarding DNA testing on firearms, most of the time she has discovered a mixture of several DNAs on a firearm. *Id.* at 113.

In the instant case, Investigator Lyda testified she was presented with a .40 caliber handgun and a .223 AR-style rifle,[5] and she fingerprinted both firearms. *Id.* She was unable to lift any fingerprints off either firearm. *Id.* at 114-15. She did not conduct DNA testing on the firearms as it was not requested by the police. *Id.*

Corporal Jeremy Crist of the Harrisburg Bureau of Police, who was assigned to the vice unit, testified he was the affiant for the search warrant for the duplex. *Id.* at 126. He conducted an investigation before applying for the search warrant. *Id.* Specifically, he used an undercover police officer and a confidential informant to purchase narcotics on two separate occasions from a male. *Id.* at 127. Both times, the male entered the duplex and returned with narcotics. *Id.* The transactions occurred within 72 hours of the execution of the search warrant. *Id.* Corporal Crist confirmed that his investigation did not reveal the identity of the male, who sold the drugs to the undercover officer and confidential informant. *Id.*

---

[5] The parties stipulated that both firearms were fully functional and capable of discharging ammunition. *Id.* at 141.

Regarding the execution of the search warrant, Corporal Crist testified that, as he was on his way to the kitchen, when he was "going up the steps, [he saw] the top of a purse. It [was] sitting on the floor…to the right side." *Id.* at 133. He saw a loaded .40 caliber handgun sticking out of the brown purse. *Id.* The eTrace revealed the handgun was purchased by Ms. Mathis a year or so before the search. *Id.* at 141. Corporal Crist explained that he set himself up in the kitchen, and he inventoried evidence as it was discovered by the police. *Id.* at 128.

Corporal Crist testified that three people were in the duplex when the police executed the search warrant. *Id.* at 130. Specifically, Ms. Mathis, Appellant, and a juvenile were inside. *Id.* He noted that an electric bill, which contained Appellant's name and the address of the duplex, was discovered during the search. *Id.* at 144. On June 25, 2021, before the search warrant was executed, Appellant completed an application with the Pennsylvania Department of Transportation to have his driver's license address changed to the duplex's address. *Id.* at 145. Corporal Crist testified there was no evidence that any adults other than Appellant and Ms. Mathis lived in the duplex. *Id.* at 147.

He indicated that, prior to the police searching the duplex, he spoke to Appellant and asked him if there were any illegal items in the house. *Id.* at 131. Appellant admitted "everything" in the second-floor middle spare room belonged to him. *Id.* at 132. He specifically told the corporal that he would

find marijuana and money. *Id.* The money totaled $4,399.00 and was mostly twenty-dollar bills. N.T., 8/15/24, at 151. Appellant was not under the influence of any controlled substance when he made this admission. N.T., 8/14/24, at 132. Corporal Crist testified Appellant does not have a medical marijuana card, and he is not legally permitted to possess a firearm in Pennsylvania. *Id.* at 145.

The Commonwealth offered Chief Detective Corey Dickerson of the Dauphin County Criminal Investigation Division as an expert in street-level drug trafficking. He testified that people who are buying marijuana for personal use do not buy marijuana in large vacuum-sealed bags. N.T., 8/15/24, at 175. Rather, users tend to buy small baggies of marijuana. *Id.* at 173. Detective Dickerson testified that, based on his training and experience, Appellant possessed the marijuana with the intent to distribute. *Id.* at 199. He noted his opinion was based on the amount of marijuana, the location of the marijuana in the room, the packaging, and the amount of cash possessed by Appellant. *Id.* Also, he noted Appellant lacked a legitimate source of income. *Id.* at 185.

Regarding drug dealers and the possession of firearms, Detective Dickerson indicated that marijuana drug dealers "frequently" carry firearms. *Id.* at 179. He noted that they tend to carry firearms to protect their drugs and money from other criminals. *Id.* Detective Dickerson testified that rifles are possessed by drug dealers as deterrents for other criminals to stay away.

*Id.* at 190. Further, drug dealers use rifles as "bragging elements." *Id.* That is, they use them to demonstrate that they have power with access to larger weapons. *Id.* He noted that firearm-related incidents are often related to drug trafficking in the Harrisburg area. *Id.* at 191.

Detective Dickerson also testified that, in his experience, it is not unusual for a drug dealer, who is unable to purchase a firearm legally, to ask his paramour to purchase a firearm for him. *Id.* at 201. In law enforcement, this type of purchase is called "straw purchasing." *Id.* He noted that it is not unusual for a male drug dealer to ask his female companion to hide a handgun in her purse. *Id.* Detective Dickerson testified that, based on his experience and training, in the case *sub judice*, Appellant (the person dealing drugs) utilized the firearms to protect his home. *Id.* at 203.

Appellant took the stand in his own defense. He testified that he inherited the duplex from his grandmother. *Id.* at 208. He indicated he lived in the duplex with his fiancé, Ms. Mathis, and their ten-year-old daughter. *Id.* He admitted that he was unemployed on July 29, 2021, but he received unemployment funds because of the Covid-19 pandemic. *Id.* at 209. He testified Ms. Mathis also received unemployment funds during this time. *Id.* at 210. Additionally, his ten-year-old daughter made and sold hair accessories. *Id.*

Appellant admitted that, on the day of the search, he told Corporal Crist that he would find marijuana and cash in the second-floor middle spare room.

*Id.* at 213. Appellant indicated he knew Ms. Mathis had ammunition in the duplex, but he did not know that it was in the second-floor middle spare room. *Id.* at 214. He also confirmed that he knew Ms. Mathis had two firearms, but he denied knowing where she stored them. *Id.* at 217. He denied ever touching or handling the two firearms. *Id.* He denied accompanying Ms. Mathis when she purchased the firearms. *Id.* at 226.

Appellant indicated that various family members, including Michael Johnson, spent time at the duplex. *Id.* at 216. He suggested that Mr. Johnson made the two controlled buys to the police; however, he indicated that, at the time of the transactions, he was unaware that Mr. Johnson had done so. *Id.*

On cross-examination, Appellant indicated that he has owned the duplex since April 21, 2019, and he is the sole owner. *Id.* at 228. Mr. Johnson did not have a key to the duplex. *Id.* at 229. Appellant admitted that the third floor has two bedrooms. *Id.* One of the bedrooms is his daughter's bedroom. *Id.* The other, larger bedroom, where the AR-style rifle was found, is Appellant's and Ms. Mathis' bedroom. *Id.* Appellant admitted that, when the police knocked on the door to execute the search warrant, he was asleep in the large bedroom where the AR-style rifle was found. *Id.* at 231.

Appellant admitted that he and Ms. Mathis had been together "on and off" for sixteen years. *Id.* at 232. They care about each other. *Id.* He admitted that, when Ms. Mathis purchased the AR-style rifle in 2019 and the handgun in 2017, he was unable to purchase a firearm. *Id.* at 233.

- 11 -

Ms. Mathis testified that she has a concealed carry permit. *Id.* at 243. She indicated that she purchased the handgun and kept it in her purse for protection. *Id.* at 247. She denied purchasing the handgun for Appellant. *Id.* She testified she purchased an AR-style rifle from a gun show. *Id.* at 245. She denied that Appellant was with her when she purchased the AR-style rifle. *Id.* She testified she purchased it to defend her home, and she indicated she kept it under the bed in the bedroom. *Id.* She testified that Appellant knew she had the rifle, but he did not know where she stored it. *Id.* at 248. She then testified she could not remember if she told Appellant where she stored it. *Id.* at 250. She acknowledged that ammunition was found in the second-floor middle spare room, which they referred to as "the man cave," but she indicated that she put the ammunition in the room. *Id.* at 252. She acknowledged that, if Appellant was found in possession of a firearm, he would face "pretty strong penalties." *Id.*

On cross-examination, Ms. Mathis indicated she carried the .40 caliber handgun for protection. *Id.* at 255. Ms. Mathis was unable to remember the make, model, or caliber of the rifle. *Id.* at 256. She admitted that, after the police seized the two firearms from the duplex, she purchased a small pistol. *Id.* at 260.

The Commonwealth called Corporal Crist as a rebuttal witness. He confirmed that, when the police executed the search warrant, he spoke to Appellant and Ms. Mathis. *Id.* at 262. He indicated that, after the search, he

spoke to Ms. Mathis "in-depth" about the firearms. *Id.* at 263. Upon examination by the Assistant District Attorney ("ADA"), he specifically testified as follows:

> [Corporal Crist]: [W]e talked a little bit in-depth about just about everything pertaining to those weapons. One of the first things I had a concern with was the location of the weapon. I asked her where the weapon was at, and as you even heard her state, she said it was under the bed. That's obviously not where the police located it. [It was found in the netted clothes hamper.] And she said [the handgun] was in a brown bag. She didn't state that to me then. I don't think we discussed actually what it was concealed in.
>
> I asked her what side of the bed she was sleeping on. She couldn't relay that information to me. I asked her, obviously, the make, the model pertaining to that firearm, and she couldn't give me those details either. So, there was a discrepancy about, you know, the location and how the weapon was stored.
>
> We also talked about the use of the firearms, one being the AR-style [rifle]. She said she used it for home defense, and she took it to the gun range. I thought that was a little bit odd when I was speaking to her mostly because no other gun accessories were found in the house.
>
> ***
>
> So, it wasn't in the location. I asked her how many magazines she had for that weapon because, obviously, I had already discovered the ammo pouch with eight magazines in it. It holds nine. There was nine---there was an extra. The ninth magazine was in the weapon. She said there was only one magazine for it.
>
> [ADA]: And when you say for the gun, you're specifically referring to the rifle with—
>
> [Corporal Crist]: I'm specifically talking about that, yes[.]
>
> [ADA]: Okay.
>
> [Corporal Crist]: I asked her specifically about the magazine pouches. We covered it in detail as far as what they looked like and the magazines that were in them. She had no knowledge of that item.

[ADA]: And at any point during your conversation, did she refer to herself as a gun fanatic?

[Corporal Crist]: She did.

[ADA]: Was that at the beginning of your conversation or---

[Corporal Crist]: It was towards the beginning of it when we were discussing why she has the weapons. She stated—and it was kind of like a monotone, a forced response. She said, I'm a gun fanatic, which wasn't—like, a little bit alarming.

[ADA]: Was she able to remember what year she purchased the rifle?

[Corporal Crist]: She had a little bit of difficulty recalling. She couldn't remember the year. She did state that she got it at a gun show.

*Id.* at 263-65.

At the conclusion of all evidence, the jury convicted Appellant of the offenses *supra*. The trial court sentenced Appellant to an aggregate of five years to ten years in prison. Appellant did not file a post-sentence motion; however, this timely, counseled appeal followed. All Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant sets forth the following issue in his "Statement of Questions Involved":

> 1. Did the Commonwealth fail to produce sufficient evidence that [Appellant] possessed either firearm located within the house when both firearms are owned by his [paramour] and were located only in common areas of the home and no evidence specifically linked [Appellant] to the firearms?

Appellant's Brief at 4 (suggested answer omitted).

- 14 -

Appellant challenges solely his conviction for possession of a firearm prohibited under 18 Pa.C.S.A. § 6105.[6]  Specifically, Appellant contends the Commonwealth failed to demonstrate, beyond a reasonable doubt, that he actually or constructively possessed either of the firearms, which the police seized on July 29, 2021, from his duplex.[7]  In this regard, he avers the evidence demonstrates that the firearms belonged exclusively to his fiancé, Ms. Mathis, and he "merely cohabitated" with her.  ***See*** Appellant's Brief at 11.  He contends the Commonwealth attempted to use a "guns follow drugs" reasoning to establish Appellant's constructive or joint constructive possession of a firearm; however, this reasoning is "spurious."  ***Id.***

A claim impugning the sufficiency of the evidence presents us with a question of law.  ***Commonwealth v. Widmer***, 560 Pa. 308, 744 A.2d 745, 751 (2000).  Our standard of review is well settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying the above test, we

---

[6] Since Appellant presents no challenge to his convictions for one count of possession with the intent to deliver a controlled substance and one count of possession of drug paraphernalia, we decline to address the sufficiency of the evidence as to these two convictions.

[7] We note that Appellant was convicted of one count of possession of a firearm prohibited, and, therefore, the Commonwealth was not required to demonstrate that Appellant possessed both firearms, which were seized from the duplex.  However, as discussed below, we conclude the evidence sufficiently establishes Appellant's joint constructive possession of both firearms.

may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brooks*, 7 A.3d 852, 856-57 (Pa.Super. 2010) (citations omitted). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Sanders*, 627 A.2d 183, 185 (Pa.Super. 1993). "Although a conviction must be based on 'more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty.'" *Commonwealth v. Gainer*, 7 A.3d 291, 292 (Pa.Super. 2010) (quotation omitted).

Appellant was convicted of persons not to possess a firearm under 18 Pa.C.S.A. § 6105, which relevantly provides the following:

**§ 6105. Persons not to possess, use, manufacture, control, sell or transfer firearms**

**(a) Offense defined.**—

(1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in

- 16 -

subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

\*\*\*

**(c) Other persons.--**In addition to any person who has been convicted of any offense listed under subsection (b), the following persons shall be subject to the prohibition of subsection (a):

\*\*\*

(2) A person who has been convicted of an offense under the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, or any equivalent Federal statute or equivalent statute of any other state, that may be punishable by a term of imprisonment exceeding two years.

18 Pa.C.S.A. § 6105 (bold in original).

In the case *sub judice*, Appellant, who has a prior conviction for possession with the intent to deliver a controlled substance, does not dispute that he is prohibited from possessing a firearm; however, he contends the Commonwealth failed to prove that he actually or constructively possessed a firearm. We agree with Appellant that possession is an element of the firearms offense, and the firearm was not discovered on Appellant's person so as to establish actual possession. ***See Commonwealth v. Macolino***, 503 Pa. 201, 469 A.2d 132, 134 (1983) (holding that actual possession is shown by proving the contraband was found on the defendant's person).

However, this does not end our inquiry since, as Appellant acknowledges, the element of "[p]ossession can be found by proving actual possession, constructive possession, or joint constructive possession."

*Commonwealth v. Parrish*, 191 A.3d 31, 36 (Pa.Super. 2018) (citation omitted).

We have previously determined:

Where a defendant is not in actual possession of the prohibited items, the Commonwealth must establish that the defendant had constructive possession to support the conviction. Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. We have defined constructive possession as conscious dominion, meaning that the defendant has the power to control the contraband and the intent to exercise that control. To aid application, we have held that constructive possession may be established by the totality of the circumstances.

It is well established that, as with any other element of a crime, constructive possession may be proven by circumstantial evidence. In other words, the Commonwealth must establish facts from which the trier of fact can reasonably infer that the defendant exercised dominion and control over the contraband at issue.

*Parrish*, 191 A.3d at 36–37 (internal citations and quotations omitted).

To find constructive possession, the power and intent to control the contraband does not need to be exclusive to the defendant. Our Supreme Court has recognized that "constructive possession may be found in one or more actors where the item in issue is in an area of joint control and equal access." *Commonwealth v. Johnson*, 611 Pa. 381, 26 A.3d 1078, 1094 (2011) (citation omitted).

Here, viewing the evidence in the light most favorable to the Commonwealth, as the verdict winner, we agree with the trial court that the evidence sufficiently establishes Appellant's constructive possession of the

- 18 -

firearms, which were seized from the duplex on July 29, 2019, pursuant to the search warrant. As the trial court relevantly indicated:

> While the defense seemed to take the position that because the guns found in the home belonged to Ms. Mathis, *i.e.*, there was evidence presented that she legally purchased the guns, they could not be possessed by Appellant[.] [F]or purposes of the analysis of possession, this argument fails. In cases where a defendant is not found in actual possession of a prohibited item, the Commonwealth must establish that the defendant had constructive possession of the item to support a conviction. Constructive possession is defined as "conscious dominion" of an object, meaning that the defendant has "the power to control the contraband and the intent to exercise that control." Further, the fact that another person may also have control and access does not eliminate the defendant's constructive possession; two actors may have joint control and equal access, and, thus, both may constructively possess the contraband. ***Commonwealth v. Mudrick***, 510 Pa. 305, 507 A.2d 1212 (1986).
>
> ***
>
> Here, Appellant acknowledged that he knew Ms. Mathis had a .40 caliber [handgun], he had seen it and knew that Ms. Mathis carried it with her. The handbag in which Ms. Mathis kept the gun was found out in the open on the floor, making it easily accessible and providing Appellant the opportunity to exercise control over the gun. Further, despite Appellant's testimony that he did not know Ms. Mathis kept the [AR-style] rifle in the home, it was found wrapped in a pillowcase in the couple's bedroom [in a netted hamper alongside of a wall]. [Thus, that] gun [was also] easily accessible to control. There was also admitted drug sales activity taking place in the home, and [Detective] Dickerson opined that the [AR-style] rifle would be the type of gun a person involved with drug dealing [would] use to prevent others from stealing from them. Considering the evidence presented at trial, and the inferences drawn from that evidence in the light most favorable to the Commonwealth, as verdict winner, and based upon the totality of the circumstances, there was sufficient evidence to establish that Appellant exercised conscious dominion and control over the guns found at [the duplex]. ***See Commonwealth v. Miley***, 460 A.2d 778, 784 (Pa.Super. 1983) (finding intent to exercise control over controlled substance may be established by knowledge of its presence). ***See also Commonwealth v. Nelson***, 582 A.2d

1115, 1119 (Pa.Super. 1990) (holding constructive possession may be found where no individual factor establishes possession, but the totality of circumstances establishes such); ***Commonwealth v. Santiesteban***, 552 A.2d 1072, 1074-75 (Pa.Super. 1988) (finding trier of fact could infer constructive possession where the defendant lived in house, had access and control of floor where the contraband was recovered, and large amount of cash was found in his bedroom)[.]

Because there was no question that Appellant lived in the home where the guns were found, and those guns were accessible to him, the inference could be made that he had constructive possession over those guns. Accordingly, Appellant's argument that the Commonwealth failed to prove beyond a reasonable doubt that he possessed a firearm lacks merit.

Trial Court Opinion, filed 2/28/24, at 7-9 (citations omitted).

We agree with the trial court's sound reasoning. While Appellant claims he "merely cohabitated" with a person who legally possessed guns, the jury was free to reject this claim. Simply put, the totality of the circumstances established that Appellant knew of the existence and location of the firearms. That is, the handgun was found sticking out of Ms. Mathis' purse, which was sitting on the floor at the top of the steps on the way to the kitchen, and the AR-style rifle was found in the couple's bedroom in a netted hamper alongside of a wall. Given that Appellant was the sole owner of the duplex, and Detective Dickerson explained that it is not unusual for a drug dealer's paramour to purchase a firearm for him to assist in protecting the drugs, family, and money, we agree with the trial court that the circumstantial evidence reveals Appellant had the power and intent to control the firearms. ***See Parrish***, ***supra***.

Also, we note that it was unnecessary for the Commonwealth to establish that Appellant solely had constructive possession of the firearms. Rather, the fact that Ms. Mathis may also have control and access does not negate Appellant's constructive possession. ***Commonwealth v. Hopkins***, 67 A.3d 817, 820-21 (Pa.Super. 2013) ("[I]t is possible for two people to have joint constructive possession of an item of contraband."). Finally, the evidence does not support Appellant's contention that he was convicted of the firearms offense on a spurious "guns follow drugs" reasoning. Rather, as indicated above, the evidence, when viewed in the light most favorable to the Commonwealth, establishes Appellant exercised conscious dominion and control over the guns found at the duplex. Thus, we reject his challenge to the sufficiency of the evidence.

For all of the foregoing reasons, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 09/25/2024

- 21 -